**In re CHANEY.**

No. 1514.

District Court, W. D. Virginia,
at Harrisonburg.

Aug. 27, 1942.

Joseph I. Nachman, of Staunton, Va., for bankrupt.

J. M. Perry and L. W. H. Peyton, both of Staunton, Va., for Holly Stover.

PAUL, District Judge.

This proceeding, which is under Section 75 of the Bankruptcy Act, 11 U.S.C.A. § 203, is one in which the debtor was unable to agree with her creditors upon any terms of composition or extension and thereafter filed an amended petition under Subsection s of Section 75. The matter has been pending before the conciliation commissioner for proceedings in accordance with the provisions of Subsection s. Appraisers were duly appointed, who appraised the value of the farm owned by the bankrupt at $5,500.00, and, after overruling the creditors' exceptions to this appraisement, the appraisers report was confirmed by the conciliation commissioner on July 14, 1942.

The conciliation commissioner heard considerable evidence on the question of the fair rental value of the property and on July 20, 1942, the conciliation commissioner entered his order in which he found that the bankrupt had no personal property and no

exempt property; that her property consisted of a tract of land of about 134 acres near the town of Grottoes, in Augusta County, Virginia, on which she resided; that no unsecured claims had been filed against the bankrupt and that the principal indebtedness of the bankrupt and, as I understand it, the only debt proven in the proceedings was a debt in favor of Holly Stover constituting a first lien on the property in the amount of $13,387.25, with interest thereon at the rate of 6 per cent per annum from November 9, 1939. It was found also that there were certain other judgment liens in small amounts, but which had not been proven in the proceeding; that taxes on the property were delinquent for the years of 1939, 1940 and 1941 and these, together with the taxes for the current year, aggregate $227.19 with certain interest and penalties. The conciliation commissioner found further, as embodied in his order, that a reasonable annual rental for the real estate was $500.00 per year, to be paid in semi-annual payments beginning with the payment of $250.00 on January 20, 1943. The conciliation commissioner, acting under the provisions of Subsection s (2), further found that the bankrupt was able to pay and the protection of the rights of her creditors required the payment of $330.00 a year in addition to the rental value fixed and directed that this additional sum be paid to Holly Stover, a first-lien creditor, in quarterly installments of $82.50 each, beginning on October 20, 1942. The order contained the further usual provisions that upon compliance with the terms of the order as to payments to be made and upon a condition that she should conduct the farm in a farm-like manner and not continue to let it deteriorate, the bankrupt should be entitled to continue the possession of the property for three years from the 20th day of July, 1942, and that all judicial and official proceedings pending against her in any court be stayed for a period of three years. Holly Stover, the holder of the first lien, seems to have been the only creditor who appeared in or was active in the proceedings before the conciliation commissioner and it appears that his first-lien debt is probably considerably in excess of the value of the land.

The bankrupt has asked for a review of this order in so far as it relates to the rental value fixed for the property and in so far as it requires the payment of the additional sum of $330.00 a year. The petition for review sets out that the rental value is excessive and that it is based upon evidence that the residence of the bankrupt is susceptible of being rented to outside parties for the production of income providing certain changes and alterations are made therein. It is contended that the rental value must be fixed upon the value of the property as a farm and in its present condition and that when considered from this standpoint the property does not warrant a rental value of $500.00 a year.

It is true that evidence was introduced before the conciliation commissioner to show that this farm is located adjacent to the corporation of Grottoes and that the residence on the property is from one-half to three-fourths of a mile from the center of this town. That the house is a large one which could be divided into apartments or flats and that because of the demand for housing facilities in the town of Grottoes, due to industrial activity there, the house could thus be made to produce a monthly rental of $60.00 or $80.00. It is true, of course, that the statute is dealing with farming operations and no doubt the rental value named by the statute ordinarily refers to the rental value of the property as a farm. On the other hand, if the property is so located as that the residence or other buildings upon it may be readily and conveniently used for the production of income through renting without any interruption or interference of the farming operations, there would seem no sound reason why this should not be considered in determining the rental value. I agree, however, that even if this is permissible, the rental value should be considered with regard to its immediate and present availability for such purposes and not as to its potential value based on the need for alterations, which might run to considerable expense which the bankrupt was not in position to incur.

However, I think these questions are immaterial, as there is nothing to indicate that the conciliation commissioner based his determination of the rental value on the possible or prospective use of the residence in the manner indicated. If he had done so, he would have undoubtedly fixed it much higher because the evidence of the witnesses who testified along this line stated that if the residence were used for rental to industrial workers, or others in the town of Grottoes, it alone should produce an income of $60.00 or $80.00 a month without regard to the use or operation of the farm. The determination of the conciliation commis-

sioner finds abundant justification in the testimony of the witnesses introduced by the bankrupt herself. The bankrupt introduced not less than four witnesses, all of whom were persons of the locality and are well acquainted with this particular property. These witnesses testified as to the present rental value of the property and, while their estimates varied considerably, only one of them placed the present fair rental value as less than $500.00 a year and two of the witnesses estimated the present rental value at $600.00 and at $820.00 respectively. In view of this testimony, offered by the bankrupt herself, the court cannot say that the conciliation commissioner erred in fixing the rental value at a sum which was less than the average amount named by these witnesses. For some reason the bankrupt's counsel, in the taking of the testimony, chose to refer to these witnesses as adverse witnesses although it appears that they were voluntarily summoned by the bankrupt to testify in her behalf and nothing appears to indicate why they should be considered as adverse.

■ The objection which the bankrupt offers to the requirement that she pay the sum of $330.00 a year in addition to the rental value is based on the statement that she is unable to pay it and that there is no evidence to support a finding that she is able. There is a paucity of evidence on the question of the bankrupt's income or her potential income from this farm or from any other source. The conciliation commissioner found that she had been receiving certain agricultural benefits from the United States Government and with this, and such other evidence as he had before him, reached the conclusion that the bankrupt was able to pay this additional sum and for the protection of the creditors should be required to do so. I can find nothing in the record which justifies me in saying that the conclusion of the conciliation commissioner as to the ability of the bankrupt to pay was erroneous and it is quite certain that the protection of the creditors requires this payment, or even one in a larger amount.

Subsection s (2), after providing for the payment of the rental value of the property and for the application of such payment, further provides that "the court, in its discretion, if it deems it necessary to protect the creditors from loss * * * may order sold any unexempt perishable property of the debtor, or any unexempt personal property not reasonably necessary for the farming operations * * * and may, in addition to the rental, require payments on the principal due and owing by the debtor * * * and may require such payments to be made quarterly, semiannually, or annually, not inconsistent with the protection of the rights of the creditors and the debtor's ability to pay, with a view to his financial rehabilitation".

■ In determining the rights of the court to direct these additional payments, there must always be borne in mind the primary purpose of this statute. That purpose was to give farm debtors who might not be able to pay their debts as they matured an opportunity to remain in possession of their farms for a prescribed period of years without molestation by their creditors, with the expectation that during this period of years they would be able through their farming operations to place themselves in a position whereby they could pay off their debts without having their property sold. That the moratorium thus granted under the protection of the court would give them time and opportunity to rehabilitate their financial condition and enable them to continue their vocation as farmers. Every person who files a petition under Section 75, if it is filed in good faith, impliedly states that it is his expectation that if granted the protection of this statute he will be able to work his way out of his difficulties and pay off his debts. To give him this opportunity is the whole purpose of the act.

But certainly it was not intended by Congress that a debtor could procure the protection of this act on terms which very plainly would result in making the debtor's condition at the end of the three years worse than at the beginning. It was not intended that a debtor could merely snuggle down under the protection of this law, safe from any interference on the part of his creditors, for a period of three years while the debts owing by him were constantly increasing. While the act is highly favorable to debtors, it is not entirely regardless of the rights of creditors. And it is not believed that Congress intended that a debtor should have the protection of this law during the entire moratorium period under conditions which permitted the debts to become constantly larger during that time and indicated no intention or effort on the part of the debtor to pay them. This law was in-

tended to better the condition of debtors; not to offer them a mere temporary refuge while their condition became steadily worse. Its administration should not be under conditions which plainly militate against the accomplishment of its purpose. Any payments required of the debtor should be sufficient to pay the taxes on the property and the insurance and keep it in reasonable repair and thereby preserve the security of the creditors and should, if it is at all possible, be such as to pay the current interest on the indebtedness and thereby prevent the indebtedness from increasing during the moratorium period. This is quite evidently the intention which was in the mind of Congress when it authorized the court in its discretion to require the payment to creditors of sums in addition to the rental value of the property. The act recites that this requirement may be imposed when it is necessary to protect the creditors from loss or to conserve the security. It says also that such payments shall be required not inconsistent with the protection of the rights of the creditors and the debtor's ability to pay, with a view to his financial rehabilitation. While the ability of the debtor to make such payments must and should be considered, there must be kept in mind also the rights of the creditors and the financial rehabilitation of the debtor, which is the purpose of the act. Keeping in mind this purpose, it is difficult to see how any debtor could expect financial rehabilitation if the payments made by him during the moratorium period were such as that his indebtedness would be much larger when this period was over than when he began.

It appears that in the present case there is something over $200.00 taxes delinquent on this property for several years past and that the yearly tax is approximately $50.00. It appears that there is no insurance whatever on the residence, barn or on any buildings on this farm and that the residence and other buildings, as well as the fencing and other improvements, are in a bad state of repair and constantly deteriorating. While the court has no evidence before it of the cost of reasonable insurance on these buildings, it is evident that they ought not to be left uninsured. It is evident also that ordinary repairs to the property should be made and that it should be kept in a reasonable state of repair. It is not too much to assume that these items, together with taxes, would aggregate several hundred dollars a year. The interest on the first lien debt is approximately $800.00 a year, and this debt is increased by this amount every year in which no payment is made upon the interest or principal. It will readily be seen, therefore, that the sum of $830.00 required to be paid by the conciliation commissioner will not be sufficient to pay taxes, insurance and repairs and also to pay the interest on the first lien debt. Even if the payments required are made, the first lien debt will be increasing each year through the accumulation of some unpaid part of the interest. The requirement of the conciliation commissioner is not even sufficient to preserve the present financial condition of the bankrupt, and unless she can at least prevent her financial condition from becoming worse it is difficult to see how she can rehabilitate herself at the end of the three years.

If the bankrupt filed her petition in good faith, that is in a genuine effort to rehabilitate her financial condition and place herself in a situation where she could pay her debts, she should certainly not complain of an order of court which goes even less far than she might have been required to go. And if, as she impliedly stated in her petition, she expects to rehabilitate herself through her farming operations if given an opportunity to do so, it is hard to see how she expects this rehabilitation to occur if she insists that she is unable to pay a sufficient sum to prevent her indebtedness from steadily increasing. And if she is unable to conduct her farm profitably under present conditions, it is quite certain that she can never rehabilitate herself at the end of the three years. The court may certainly take notice of the fact that at the present time farm products are high in price and that as long as the present war lasts farming will be profitable if it ever was or can be. Certainly the next few years will give to an insolvent farmer the best opportunity for rehabilitation that has existed for many years past. If he cannot rehabilitate himself under the present prospect, he can never do so.

The conciliation commissioner found that this debtor was able to pay the additional sum which he required and that the protection of the rights of creditors and the preservation of the security called for this additional payment, and I can find no evidence on which to base any conclusion that the commissioner erred in this determination. The purposes of the statute are to

effect the rehabilitation of the debtor while at the same time protecting as far as possible the rights of the creditors while this rehabilitation is taking place. The finding of the conciliation commissioner and the terms of his order are in conformity with this purpose and I see no reason why they should be disturbed. In fact, the conciliation commissioner might have gone further and required such additional payment as would at least have covered the current interest on the indebtedness and prevent the debt from increasing.

Note may be made of the fact that the bankrupt objected to any independent determination by the conciliation commissioner of the rental value of the property. This was based on some theory that in a chancery proceeding in the state courts some three years ago a commissioner of that court had occasion to report upon the rental value of the property as pertinent to the proceedings then being conducted. It appears that he reported the then rental value to be $400.00, and the bankrupt advances the idea that the rental value of this property is res adjudicata. Presumably the argument is that the conciliation commissioner must find the rental value to be the same amount as was found by the commissioner in the state court proceedings three years ago. The contention is utterly untenable. The Bankruptcy Act provides specifically that the bankruptcy court shall determine the rental value and it is neither bound by any finding of any other tribunal at a previous time nor would it have the right to abdicate the duty and responsibility imposed upon it by the statute. I see nothing objectionable in the conciliation commissioner considering this previous finding as of some evidential value in which respect it would have simply the force and effect of opinion evidence along with the opinion of other persons who testified to the same matter. As evidence it would not be conclusive. Its weight would be such as the conciliation commissioner cared to give it and that weight would, of course, be affected by the fact that a rental value of property is not a constant thing, but varies from year to year and as different conditions control. The rental value of a farming property in 1939 might be substantially different from its rental value at this time, just as the rental value of any other income producing property varies according to business conditions and business prospects.

There appear to be no sound or proper reasons for overruling the findings of the conciliation commissioner and, therefore, his order of July 20, 1942, is approved and confirmed.